UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SHERRY E. SCOTT,

                    Plaintiff,

                                                    Case No. 23-cv-618-pp

        v.

MILWAUKEE SCHOOL OF ENGINEERING,

                    Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 20) AND DISMISSING CASE

On May 16, 2023, the plaintiff filed a complaint against her former employer, alleging that it discriminated against her based on her race, gender and color in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* Dkt. No. 1. On June 28, 2024, the defendant filed a motion for summary judgment on all claims. Dkt. No. 20. The motion has been fully briefed since August 2024. Dkt. Nos. 21, 30, 36.

The court extends its regrets to the parties for the length of time it has taken to rule on the motion. This order grants the motion for summary judgment and dismisses the case.

## I.    Factual and Procedural Background

The following facts are undisputed unless otherwise noted:

The defendant is a private, non-profit university in Milwaukee, Wisconsin. Dkt. No. 32 at ¶1. It employs both full-time regular faculty and part-

1

time adjunct faculty to teach courses. Id. at ¶¶3, 7. Full-time faculty receive multi-year appointments, while adjunct faculty receive one-year contracts that do not automatically renew. Id. at ¶¶5, 9.

A. Adjunct Faculty Evaluation Methods

Adjunct faculty in the mathematics department do not undergo formal performance evaluations and primarily are evaluated based on student evaluations and "word of mouth communications from other faculty." Id. at ¶12. The mathematics department chair, Dr. Matey Kaltchev, reviews student evaluations at the end of each quarter to assess faculty performance. Id. at ¶15. The defendant also provides faculty with a copy of their student evaluations each quarter. Id. at ¶16. Kaltchev says that he does not consider student comments claiming the faculty member does not have the required subject-matter expertise and overlooks other irrelevant comments, such as that the faculty member is shy, loud, avoids eye contact, is boring or does not have command of the room. Id. at ¶¶17–18. The plaintiff disputes this, asserting that Kaltchev informed her only that he "evaluated the student evaluations for bias." Id.

The defendant asserts that its faculty senate has reviewed the questions in the student evaluation survey and "vetted" them for gender bias and "other biases." Id. at ¶14. The plaintiff disputes this, arguing that the defendant has produced no evidence of the alleged review by the faculty senate other than a statement in an affidavit by the defendant's executive vice president of academics, that she never was informed that the senate had reviewed and

2

vetted the evaluation survey for bias and that a former member of the faculty senate does not recall such a review taking place prior to his departure in late November 2019. Id. The plaintiff also argues that the defendant never raised this assertion prior to the current motion. Id.

B.   The Plaintiff's Employment and Initial Concerns About Student Evaluations

In 2015, the plaintiff began working for the defendant as an adjunct professor in the mathematics department. Id. at ¶22. Kaltchev made the initial decision to hire the plaintiff and the subsequent decisions to offer her a new contract each year through the 2019-20 academic year. Id. at ¶¶21, 23. None of the plaintiff's contracts had renewal provisions, and each provided that her assigned classes might vary from quarter to quarter, that there was a possibility of having no workload and that there was a possibility that the workload could change within a quarter. Id. at ¶¶25–26.

Kaltchev was the primary evaluator of the plaintiff's performance. Id. at ¶28. In his deposition, Kaltchev testified that he "noticed a pattern of negative student comments" about the plaintiff's "organization" during her employment. Id. at ¶29. The plaintiff disputes this; she asserts that "word of mouth communications" constitute inadmissible hearsay and that the identities of the students who allegedly made the comments are unknown. Id. The parties agree that Kaltchev met with the plaintiff in Spring 2019 to discuss her performance. Id. at ¶¶30–31. But although Kaltchev recalls discussing the students' responses (including the comments about organization) and what could be done, the plaintiff contends that she and Kaltchev "could not figure out where

3

these comments were coming from." Id. at ¶31. The defendant says that before Spring 2019, Kaltchev didn't do anything about the plaintiff's performance because the defendant usually gives new faculty "a few years" to adapt, and because Kaltchev was busy with his own teaching load; the plaintiff says that even in Spring 2019, Kaltchev did not "address concerns" about her performance. Id. at ¶32.

On May 14, 2019 (after the meeting), the plaintiff emailed Kaltchev stating that "preconceived notions that the students have and can[]not reconcile is a factor in cases such as mine—an African American woman math professor in predominantly white male classes." Id. at ¶33. The plaintiff also suggested that Kaltchev or other senior faculty could visit her class and express support for her to try to "level the playing field." Id. at ¶34. This was the first time the plaintiff raised concerns to Kaltchev about her student evaluations, though the plaintiff contends that faculty "regularly discussed bias" in student evaluations. Id. at ¶¶35, 40. Kaltchev reviewed the plaintiff's evaluations from the current and prior academic year for evidence of bias, stereotyping or other comments that could have been related to her race or sex. Id. at ¶38. Kaltchev says that he found no evidence of bias. Id. at ¶39. The plaintiff disputes this, arguing that Kaltchev did not review the evaluations closely enough for "subtler" signs of bias than, for example, racial slurs. Id.

The plaintiff asserts that in a faculty meeting that took place during the 2018-19 academic year, Kaltchev "raised the general issue of bias in student evaluations;" the defendant says that this assertion contradicts her deposition

testimony, in which she testified only that the conversations were about bias in general, not specifically about bias in student evaluations. Dkt. No. 37 at ¶23. The plaintiff says that she recalls, not only that the faculty discussed the issue of bias in student evaluations, but the faculty forming a committee to investigate other ways to measure faculty performance. Id. at ¶26. The plaintiff also states that there was at least one follow-up meeting within one or two months after the faculty committee was formed; though she recalls the committee coming up with some proposals for other ways to evaluate faculty performance, there was no follow-up after that. Id. at ¶28.

C.    The October 2019 Assistant Professor Position

In October 2019, the plaintiff applied for a regular assistant professor position with the defendant. Dkt. No. 32 at ¶¶41–42. In support of her application, the plaintiff submitted three letters of recommendation which she argues "laud[ed]" her teaching skills; the defendant contends that the letters mentioned the plaintiff's "teaching ability as a teaching assistant about 20 years prior to her October 2019 application," but that the letters focused more on her research. Id. at ¶43-44. The parties agree that "[a] critical aspect of each candidate's application the search committee placed emphasis on were letters of recommendation that addressed each candidate's teaching abilities." Id. at ¶45.

The search committee for the position for which the plaintiff applied consisted of ten of the defendant's faculty members; Kaltchev was the chair. Id. at ¶¶46–47. Committee members submitted a ranking of up to ten of their top

5

candidates. Id. at ¶48. The parties dispute whether any of the committee members ranked the plaintiff in their top ten; the defendant says none of the committee members did so, but the plaintiff says that one member thought she was one of the best candidates and ranked her in his top eight and says she recalls that another committee member also ranked her in the top eight. Id. at ¶49. The parties agree that a member of the search committee, Dr. Bruce O'Neill, believed that the plaintiff was one of the best candidates for the position. Dkt. No. 37 at ¶9. But the defendant asserts that the committee first conducted a "preliminary initial narrowing" of the applications, then identified their top candidates whom they'd like to interview; it asserts that although the plaintiff survived O'Neill's (and another faculty member's) initial narrowing, she did not make any committee member's final top candidate ranking. Id. at ¶10.

Sometime in mid-November 2019, O'Neill informed the plaintiff that she "didn't make the cut" for the assistant professor position. Id. at ¶12. He informed the plaintiff that she was "one of his preferences" and that "one other person thought so too." Id. The plaintiff alleged in her complaint that O'Neill had this conversation with her around December 20, 2019. Dkt. No. 1 at ¶14. But in O'Neill's sworn declaration, submitted by the plaintiff in opposition to the defendant's motion for summary judgment, he avers that this conversation took place in mid-November 2019. Dkt. No. 34 at ¶18. And O'Neill averred that his employment with the defendant ended at the end of November 2019, "around November 30, 2019." Id. at ¶3. The defendant does not dispute the plaintiff's version for the purposes of summary judgment, but points out that

O'Neill's recollection of the date is different from the plaintiff's. Dkt. No. 37 at

¶12.

The defendant offered the position to first one, then another female

candidate, both of whom declined the offer. Dkt. No. 32 at ¶¶56–57. The

defendant asserts that it "was about" to make another offer to a third female

candidate, but that she withdrew her application before the offer was made; the

plaintiff says the defendant has provided no evidence of this. Id. at ¶58. The

defendant says that the initial, fall 2019, applicant search did not result in

enough qualified candidates to fill the position; the plaintiff disagrees, asserting

that *she* was qualified to fill the position. Id. at ¶59. Sometime around

February 20, 2020, the defendant reviewed candidates who hadn't been

considered in the initial process because they'd submitted applications after

the defendant had suspended the new applicant search. Id. at ¶60.

In Spring 2020, the defendant hired Jonathan Cox, a White male, for the

position. Id. at ¶61. Cox had applied for the position in the original application

period, but was not interviewed in the first round of applicants because he

submitted his application in November 2019, after the search committee had

stopped reviewing new applicants. Id. at ¶62. The defendant hired Cox as an

"Associate Professor" (not an assistant professor, which was the position for

which the defendant had solicited candidates) "because Cox held the rank of

Associate Professor at his prior institution, and at [the defendant] it is common

practice to hire candidates at the same rank as their prior institution." Id. at

7

¶63. The plaintiff says the defendant has provided no evidence to support this fact. Id.

The defendant says that in 2019, its math department "began efforts to shift the composition of its faculty." Id. at ¶66. This "composition change" reduced the number of adjunct faculty and increased the number of full-time faculty, because the defendant had determined "that full-time faculty provide a better classroom experience to . . . students than part-time adjunct faculty." Id. at ¶68. So in 2019 and 2020, several of the defendant's departments began to hire more full-time faculty and reduce the number of adjuncts. Id. at ¶67. The defendant says it hired three full-time math faculty to start in the 2020-21 school year; the plaintiff says it hired four. Id. at ¶70. At any rate, Cox was one of those full-time hires. Id. at ¶71. That meant that the defendant needed to reduce the number of adjunct faculty in the math department; it had nine during the 2019-20 academic year, but only five in the 2020-21 academic year. Id. at ¶¶72-74.

D.    The Plaintiff Raises More Concerns of Bias in Student Evaluations

On April 23, 2020, the defendant's registrar's office sent an email to students, faculty and staff announcing the course schedule for Fall 2020. Id. at ¶76. Shortly thereafter, the plaintiff forwarded that email to Kaltchev, as well as to the vice chair of the mathematics department and the administrative assistant to the department, and asked whether she was going to be assigned any classes in the fall. Id. at ¶79. Kaltchev responded stating that he did not know, saying that there were a lot of "uncertainties" for the upcoming quarter.

8

Id. at ¶80. The plaintiff replied that she didn't understand, asking why other adjuncts received class assignments but she did not. Id. at ¶81.

A few days later, Kaltchev and the plaintiff spoke by phone; Kaltchev told the plaintiff that the Fall 2020 adjunct faculty assignments were tentative and that "no adjunct faculty had received a contract at that time." Id. at ¶82. On May 5, 2020, Kaltchev clarified by email that if the defendant were to decide not to offer an adjunct a new contract, "it [would] be based on performance evaluation as evidenced by student feedback, i.e., [C]lass [C]limate student evaluations, etc." Id. at ¶83 (brackets in original). That same day, the plaintiff again raised concerns to Kaltchev and Rebecca Ploeckelman, Director of Human Resources, about "bias that underlines these student evaluations." Id. at ¶¶84, 86. The defendant says that in the year since the plaintiff had initially brought up her concerns about bias in evaluations, she'd not raised the issue again even though she'd received student evaluations for the three academic quarter in the interim; the plaintiff believes that she had raised her concerns with Kaltchev. Id. at ¶85.

Kaltchev then reviewed the plaintiff's student evaluations from the current and prior academic year, as he had done in 2019, looking for "some evidence supporting [the plaintiff's] claims of bias, of stereotyping, or something else unique in her evaluations, as compared to other Mathematics Department faculty evaluations." Id. at ¶¶87–88. Kaltchev stated that he did not find any evidence supporting the plaintiff's claims of bias. Id. at ¶89. The plaintiff disputes this, again arguing that Kaltchev's review was too cursory,

and that again he had not looked for "subtler" signs of bias. Id. Kaltchev communicated his findings (or lack thereof) to the plaintiff in a May 6, 2020 email, informing her that her "student evaluations do not point to any bias or make mention of your race as a factor and we have no reason to believe that bias or race have played a factor in these evaluations." Id. at ¶90. Kaltchev asked the plaintiff to provide specific examples of bias to ensure he was not "overlooking anything." Id. at ¶91. The defendant says the plaintiff provided no such explanation or examples; the plaintiff says she tried to talk with Kaltchev by phone to provide examples, "to no avail." Id. at ¶92. The plaintiff responded to Kaltchev's email later that day, thanking him for his "prompt response" and saying that the two had not had "much luck discussing this matter so far;" she opined that "someone else needs to help," as she'd mentioned in a prior email. Id. at ¶93.

Ploeckelman then became involved. Id. at ¶94. On May 6, 2020—the same day as the email exchange between the plaintiff and Kaltchev—Ploeckelman sent the plaintiff an email, asking the plaintiff to explain why she felt that the student evaluations were biased and asking her to express her concerns about Kaltchev. Id. at ¶96. A couple of days later, Ploeckelman suggested that she and the plaintiff speak by phone or by video and asked the plaintiff when she'd be available. Id. at ¶97. The plaintiff gave Ploeckelman a written summary of her concerns, although it didn't point to specific comments or biases in student evaluations. Id. at ¶99. The two spoke by video on May 11, 2020; the plaintiff recalls telling Ploeckelman that the students "have these

10

ideas in their heads," such as if she misstated the day of the week the students thought she was disorganized, characterizing the students has having a "crazy standard." Id. at ¶100. The plaintiff recalls that Ploeckelman said she'd "go through these things." Id. Kaltchev then provided Ploeckelman with copies of the plaintiff's student evaluations. Id. at ¶101. A couple of weeks later, the plaintiff and Ploeckelman again spoke by phone, but the connection was bad so the plaintiff emailed Ploeckelman. Id. at ¶104.

Ploeckelman conducted her own review of the plaintiff's student evaluations from Spring 2018 through Winter 2019-20. Id. at ¶105. The parties dispute whether Ploeckelman asked the plaintiff to identify the biases in the student evaluations and whether she did so; the plaintiff says that Ploeckelman never specifically asked the plaintiff to identify the biases in student evaluations, and says that on the May 11, 2020 video call the plaintiff provided a "general explanation," expecting that there'd be further discussions after Ploeckelman reviewed the student evaluations. Id. at ¶106. Ploeckelman reviewed the evaluations for any evidence of stereotypes or bias based on gender or race and compared the plaintiff's evaluations to those of other adjunct faculty in the mathematics department. Id.at ¶¶107–108. Ploeckelman emailed the plaintiff on June 5, 2020, informing her that Ploeckelman had not found any evidence of racial or gender bias in the plaintiff's evaluations. Id. at ¶109. The plaintiff did not provide a substantive response to this email and did not discuss Ploeckelman's findings further with her. Id. at ¶111.

11

The plaintiff asked Kaltchev and Ploeckelman to bring in an outside party with expertise in diversity issues to discuss possible bias in student evaluations. Dkt. No. 37 at ¶60. The plaintiff implies that Kaltchev and Ploeckelman had not received enough specific training on identifying bias. Id. at ¶¶42–46.

E.    The Contents of Plaintiff's Student Evaluations

The student evaluation survey in question asks students to identify "things the professor does well" and "things which could be improved." Dkt. No. 37 at ¶14. The defendant states that the plaintiff's evaluation scores were "consistently below the average Mathematics Department adjunct faculty evaluations." Dkt. No. 32 at ¶112. The plaintiff does not directly dispute this, but argues that the scores reflect student bias. Id. The parties do not dispute that the *written* comments contained in the plaintiff's evaluations were similar to comments made about other mathematics department faculty who were not part of the plaintiff's protected class. Id. at ¶113. The plaintiff asserts she has testified that a bias assessment requires a "thorough, holistic investigation of the student comments in their entirety," but she maintains that she identified several potentially biased student comments. Id. at ¶116. The plaintiff recalled student comments about her being disorganized, and testified that "student perceptions of her organization [are] skewed or biased. Id. at ¶117. She clarified that "the perception of her being disorganized was not based on her race and gender, but rather how small things are skewed, misunderstood, and magnified for women and people of color." Id. at ¶118. And she conceded that "there were

12

equal comments about her being organized, so there could be a bias for her and a bias against her." Id. at ¶119. The plaintiff identified one student comment from a student who said that maybe the plaintiff's teaching style "simply [did] not match up" with the student's learning style as a comment about her "teaching style" as possibly reflecting bias, as well as comments "about students seeking assistance from a tutor and having problems accepting [the plaintiff's] instructions." Id. at ¶¶126, 129.

The defendant asserts that a White male adjunct professor, Joshua Jaszewski, received similar comments in his student evaluations, including comments about disorganization, his teaching style and students' need for outside tutoring. Id. at ¶¶122–23, 127, 130. The plaintiff disputes this, arguing that "there's more in [her] comments that hint at some underlying factors, underlying assumptions" that were not present in Jaszewski's comments. Id. at ¶¶127, 130.

F.    The Defendant Declines to Offer the Plaintiff a New Contract

In late June or early July 2020, after the defendant had reviewed student evaluations for adjuncts and considered whether it needed specific adjuncts to teach specific courses, Kaltchev decided not to offer the plaintiff a new contract. Id. at ¶¶131–32. On July 7, 2020, Kaltchev told Ploeckelman that he would not be offering new contracts to the plaintiff or Jaszewski. Id. at ¶133. Kaltchev informed the plaintiff of his decision a week later. Id. at ¶135. Kaltchev made this decision because the defendant did not need two additional adjunct faculty positions for the upcoming year and both the plaintiff's and

13

Jaszewski's evaluations were below average compared to the other adjuncts in the department. Id. at ¶138.

The defendant *did* decide to offer a new contract to another White male adjunct faculty member, Jeffrey Rolland. Id. at ¶140. The defendant asserts that even though Rolland's student evaluations were similar to both the plaintiff's and Jaszewksi's, it needed Rolland to continue teaching discrete mathematics to actuarial science students. Id. at ¶¶141–42. The plaintiff asserts that the defendant has provided no evidence (other than Kaltchev's assertion) that the defendant offered Rolland a contract only because it needed him to teach discrete mathematics and says she could have taught the course if asked. Id. at ¶140. She also asserts that the defendant has provided no evidence that Rolland's student evaluations were "similar to, and maybe a little higher than," the plaintiff's and Jaszewski's. Id. at ¶142. The following year, the defendant did not offer Rolland a new contract due to below average student evaluations. Id. at ¶144.

G.    The Plaintiff's Administrative Agency Proceedings

The plaintiff filed a charge of discrimination with the Wisconsin Equal Rights Division in October 2020. Id. at ¶145. She cross-filed the complaint with the EEOC. Dkt. No. 37 at ¶69. The initial charge did not contain any allegations about the October 2019 assistant professor position. Dkt. No. 132 at ¶146. The initial charge focused on the defendant's decision not to offer the plaintiff a new contract. Id. at ¶147. On March 31, 2021, the plaintiff filed an amended charge and included allegations related to the October 2019 position.

14

Id. at ¶148. The plaintiff received a Notice of Right to Sue letter on February 15, 2023, and filed this case ninety days later, on May 16, 2023. Dkt. No. 1 at ¶5.

## II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not

15

extend to drawing inferences that are supported by only speculation or conjecture." <u>Fitzgerald v. Santoro</u>, 707 F.3d 725, 730 (7th Cir. 2013) (quoting <u>Harper v. C.R. Eng., Inc.</u>, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." <u>Fitzgerald</u>, 707 F.3d at 730 (quoting <u>Makowski v. SmithAmundsen LLC</u>, 662 F.3d 818, 822 (7th Cir. 2011)).

### III.    **Motion for Summary Judgment**

The complaint raises three causes of action—discrimination based on race, discrimination based on gender and discrimination based on color. Dkt. No. 1 at ¶¶40-60. Each of the three causes of action alleges that the defendant committed the particular type of discrimination (race, gender, color) through two employment actions: failing to hire the plaintiff for the assistant professor position in 2019, and failing to offer her an adjunct professor contract for the 2020-21 academic year.

In its summary judgment motion, the defendant argues that it is entitled to summary judgment on all three causes of action to the extent that they are based on the defendant's failure to offer the plaintiff an adjunct professor contract for the 2020-21 academic year, asserting that the plaintiff has not established a *prima facie* case of discrimination as to that employment action and that she has not established that the defendant's stated, non-discriminatory reason for not offering her that contract was pretextual. Dkt. No. 21 at 5-15. It argues that it is entitled to summary judgment on all three

16

causes of action to the extent that they are based on the defendant's 2019 failure to hire the plaintiff for the assistant professor position, asserting that the claims related to that employment action are time-barred. Id. at 16-18. Like the defendant, the court first will discuss the plaintiff's claim that the defendant discriminated against her on the basis of her race, gender and color in failing to offer her an adjunct contract for the 2020-21 academic year, then will address her claim that the defendant discriminated against her on the basis of her race, gender and color in 2019 by failing to hire her for the assistant professor position.

A.     Failure to Offer the Plaintiff an Adjunct Contract for the 2020-21 Academic Year

1.     *The Parties' Arguments*

The defendant begins with the plaintiff's claim that it discriminated against her by failing to offer her a new adjunct contract for the 2020-21 academic year. Dkt. No. 21 at 5. The defendant asserts that the plaintiff must make a *prima facie* showing that "(1) she is a member of a protected class; (2) she was meeting [the defendant's] legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably. Id. (citing Brewer v. Bd. of Trs. of Univ. of Ill., 479 F.3d 908, 915 (7th Cir. 2007)). The defendant argues that the plaintiff cannot establish a *prima facie* case because she was not meeting the defendant's legitimate expectations nor did the defendant treat similarly situated employees more favorably. Id. at 6–7.

17

The defendant asserts that the plaintiff's student evaluations were consistently below average for mathematics department adjunct faculty. Id. at 7. It says that this trend continued even after the plaintiff met with Kaltchev to discuss her student evaluations in spring 2019. Id. The defendant argues that the poor student evaluations demonstrate that the plaintiff was not meeting the defendant's legitimate expectations. Id.

The defendant contends that it did not offer a new contract to Jaszewski, a White male, because he received similar student evaluations. Id. at 8. It argues that Jaszewski was similarly situated to the plaintiff and that its identical treatment of both the plaintiff and Jaszewski rebuts any inference of discrimination. Id. The defendant anticipates that the plaintiff might argue that Rolland, another White male, is a comparator. Id. It concedes that although Rolland also received below average evaluations, the defendant offered him a new contract so that he could continue teaching one specific subject that the defendant needed in its course catalog. Id. The defendant emphasizes that it did not renew Rolland's contract the following year because of his poor student evaluations. Id.

The defendant argues that even if the plaintiff had established a *prima facie* case, it had a legitimate, non-discriminatory reason to decline to offer her a new contract. Id. The defendant asserts that it had decided to adjust its faculty composition to employ more regular faculty rather than adjunct faculty. Id. at 9. It states that this "shift" in faculty composition began in 2019, and that by the 2020-21 academic year, it had hired three full-time faculty in the

18

mathematics department and needed to adjust the number of adjuncts accordingly. Id. at 10. It decided which adjuncts to cut based on their student evaluations and the needs of the department going forward. Id.

The defendant argues that the plaintiff cannot survive summary judgment by speculating that her student evaluations were inherently biased. Id. at 11. The defendant argues that the plaintiff's own description of the bias in student evaluations cuts both ways; she testified that students could be biased against her due to her race and sex, but also that bias could be present in a White male's evaluations for some other reason. Id. The defendant argues that the plaintiff was unable to identify specific comments that she believed reflected bias. Id. at 11–12. The defendant says that although the plaintiff first asserted that comments about her organization could be the result of bias, she conceded that there were both favorable and unfavorable comments about her organization and that Jaszewski also received comments about being disorganized, demonstrating that there was no race-based or sex-based bias present. Id. at 12. The defendant argues that the other comments to which the plaintiff objected—comments about her teaching style and the fact that students sought tutoring to supplement it—were present on Jaszewski's evaluations, too. Id. The defendant argues that because a White male faculty member received similar comments, there is no evidence of discriminatory bias in the plaintiff's evaluations. Id. The defendant maintains that it twice vetted the plaintiff's evaluations and found no evidence of bias. Id. at 13. It argues that its reliance on the evaluations in making employment decisions could not

19

be evidence of discriminatory intent if it found that there was no discriminatory bias present in the evaluations. Id.

The defendant contends that there is an inference of non-discrimination because the same actor both hired the plaintiff and later declined to offer her a new contract. Id. at 14. It argues that Kaltchev made the decision to offer the plaintiff an adjunct contract in five consecutive academic years prior to deciding not to offer her a contract for the 2020-21 academic year. Id.

The defendant asserts that the plaintiff cannot establish that the defendant's reliance on student evaluations was pretextual. Id. at 15. It says that the plaintiff must show that its stated reason "is a deliberate falsehood" and a pretext for discrimination. Id. (quoting Forrester v. Rauland-Borg Corp., 453 F.3d 416, 419 (7th Cir. 2006)). The defendant asserts that there is no evidence in the record that its stated reliance on student evaluations was a falsehood or a pretext for discrimination. Id. The defendant contends that the plaintiff's claim must fail as a matter of law. Id.

The plaintiff responds that there is are genuine disputes of fact regarding whether she was meeting the defendant's legitimate performance expectations and whether the defendant knowingly relied on biased student evaluations to measure adjunct faculty performance. Dkt. No. 30 at 23. She asserts that Kaltchev and Ploeckelman's review of the plaintiff's student evaluations was insufficient because they looked only for explicitly discriminatory comments and stereotypes rather than subtler signs of bias. Id. at 24–25. She argues that neither Kaltchev nor Ploeckelman received specific training regarding

20

identifying bias. Id. at 25. The plaintiff maintains that it was improper for Kaltchev to rely on the evaluations to make employment decisions when he was aware of these issues. Id.

The plaintiff also argues that there is a genuine dispute over whether the defendant treated adjuncts outside of the plaintiff's protected class more favorably. Id. at 26. She points to Rolland, a White male, who was offered a new contract despite having student evaluations similar to hers. Id. The plaintiff argues that she was qualified to teach discrete mathematics, so the defendant's decision to keep Rolland instead of her suggests discriminatory intent. Id. The plaintiff also contends that the defendant offered adjunct contracts to three, non-Black female employees for the 2020-21 academic year and says a factual dispute exists as to whether those women were similarly situated to her. Id. at 27.

The plaintiff asserts that the defendant's stated reason for offering Rolland a contract (that it needed Rolland to continue teaching discrete math) was pretextual. Id. at 28. She argues that Kaltchev never stated this reason to the plaintiff when she asked why she was not offered a new contract. Id. The plaintiff maintains that she was qualified to teach discrete math and that the defendant's decision not to retain her to do so was motivated by discriminatory intent. Id.

The plaintiff argues that the defendant's "common actor" argument is not appropriate at summary judgment. Id. at 29. She says that this is an inference

21

that should be argued to the jury rather than the court on summary judgment. Id. (collecting cases).

2. *Analysis*

At the summary judgment stage, a plaintiff making a Title VII claim may use multiple approaches. She may utilize the McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973). A plaintiff using the McDonnell Douglas framework has the initial burden of establishing that she (1) belonged to a protected class; (2) was meeting her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was similarly situated to other employees who were not members of the protected class and were treated better. David v. Bd. of Trs. of Cmty. Coll. Dist. No. 50, 846 F.3d 216, 225 (7th Cir. 2017). If the plaintiff satisfies that burden, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. If the employer does so, the burden shifts back to the plaintiff to show that the employer's explanation is pretextual. Id. A plaintiff also may present Title VII claims based on the evidence a whole as described in Ortiz v. Warner Enterprises, Inc., 834 F.3d 760, 765 (7th Cir. 2016). Under Ortiz, the court "ask[s] whether the totality of the evidence shows discrimination." Id. (citing Ortiz, 834 F.3d at 765). "Evidence must be considered as a whole, rather than asking whether a particular piece of evidence proves the case by itself." Ortiz, 834 F.3d at 765.

The plaintiff's brief states that she has chosen to use the McDonnell Douglas burden-shifting framework to organize the evidence regarding her claim that the defendant discriminated against her by not offering her an adjunct contract for the 2020-21 academic year. Dkt. No. 30 at 21. She asserts she has shown that she belongs to a protected class (three classes, in fact—race, gender and color), that she was meeting the defendant's legitimate expectations, that she suffered an adverse employment action and that the defendant treated similarly situated employees outside of her protected classes more favorably. Id. The defendant does not dispute that the plaintiff is a member of protected classes, nor does it dispute that the plaintiff suffered an adverse employment action. Rather, the defendant argues that the plaintiff cannot meet her burden to prove a *prima facie* case under the McDonnell Douglas framework because she cannot establish the second and fourth elements: that she was meeting the defendant's legitimate expectations and that the defendant treated similarly situated employees outside the protected classes better than it treated the plaintiff. Dkt. No. 21 at 7-8. In support of both arguments, the defendant relies on its assessment of the plaintiff's performance as reflected in the student evaluations. Id. The plaintiff has responded that there is a genuine dispute as to whether she was meeting the defendant's legitimate performance expectations and asserts that the defendant "knowingly relied on problematic and/or biased student evaluations as the primary measure of adjunct faculty performance" when deciding not to offer her a contract. Dkt. No. 30 at 23.

23

The plaintiff has not demonstrated that there is a genuine dispute regarding whether she was meeting the defendant's legitimate performance expectations. First, the plaintiff implies that it was improper for the defendant to rely on student evaluations that she had alleged were the result of bias. Seventh Circuit caselaw does not support this implication. The Seventh Circuit has affirmed the dismissal of a professor's Title VII discrimination claim based on his employer's reliance on student evaluations despite assertions of bias, primarily because the defendant applied the same standard of evaluation to all professors. Abuelyaman v. Ill. State Univ., 667 F.3d 800, 812–13 (7th Cir. 2011) ("[Plaintiff's] complaint about using student assessments in professors' evaluations does not show a discriminatory animus because every professor in the IT School was subjected to the same evaluation requirements, and at least one foreign-born faculty member of color performed well in the student assessment area.").

A lower court in this circuit has taken a similar approach. In Omachonu v. Shields, Case No. 15-CV-069, 2018 WL 1175319 (W.D. Wis. Mar. 5, 2018), the plaintiff argued that the defendant employer's reliance in part on student evaluations when deciding to deny her tenure was improper because the evaluations may have been tainted by discriminatory bias. Id. at *10–12. The court granted summary judgment for the employer, in part because "plaintiff cite[d] no case law, nor could the court find any, standing for the proposition that an adverse employment decision influenced in part by the possibly racially-biased student evaluations could support a discrimination claim by

24

itself." Id. at *11. The Omachonu court came to this conclusion despite "the possibility, even likelihood, that some student evaluations may have been contaminated by racial and ethnic bias." Id. at *12.

The plaintiff has presented no evidence that the defendant did not use student evaluations to evaluate the performance of *all* adjunct professors. Like the defendant in Abuelyaman, the defendant here considered the student evaluations of all adjunct professors when deciding which adjuncts to offer new contracts. When the plaintiff expressed concerns that the negative comments in *her* student evaluations were the result of bias, the defendant took the plaintiff's concerns seriously. Kaltchev conducted an independent review of the plaintiff's student evaluations, as did Ploeckelman, and neither found evidence that the students' negative comments were the results of bias. The plaintiff has not presented expert testimony rebutting their finding, only her own lay opinion. She argues that Kaltchev and Ploeckelman were not properly trained to identify bias, but the plaintiff has not presented evidence that such expert training would have revealed signs of bias not visible to the untrained eye, or that *she* has training to assess bias. Nor has she presented evidence showing that when a student called her "disorganized," that criticism was the result of bias, whereas when a student called Jaszewski "disorganized," it was not. The plaintiff insists that the defendant "intentionally" relied on biased student evaluations, but she has presented no evidence showing that the evaluations *were* biased, or that the defendant *knew* that the evaluations were biased but relied on them anyway. Even at the summary judgment stage, the plaintiff has

25

not been able to articulate what it was about the comments in her student evaluations that shows they were the result of bias, or how Kaltchev and Ploeckelman (or someone trained in the identification of bias) would have been able to identify such bias. The plaintiff has not presented evidence to establish the second element of the McDonnell-Douglas *prima facie* case—that she was meeting her employer's legitimate expectations.

The defendant also argues that the plaintiff has not established the fourth element of the McDonnell Douglas *prima facie* case—that the defendant treated similarly situated employees outside the protected classes better than it treated the plaintiff. It emphasizes that Jaszewski, a White male, received substantially similar student evaluations to the ones the plaintiff received and that the defendant did not renew his contract for the same reason that it did not renew the plaintiff's. Dkt. No. 21 at 8. The plaintiff does not address the defendant's argument regarding Jaszewski. She argues that *Rolland* was the similarly situated employee whom the defendant treated better than it treated her. Dkt. No. 30 at 26. She emphasizes that Rolland is a White male who was offered an adjunct contract for the 2020-21 academic year when she was not. Id. She also asserts that the defendant offered adjunct contracts for the 2020-21 year to three other non-Black employees (these employees were female). Id. at 27.

The plaintiff has presented no evidence that the three non-Black females to whom the defendant offered adjunct contracts for the 2020-21 academic year were similarly situated to her. She has not explained whether those

individuals had contracts in the past, whether they had received student evaluations or whether, if they did receive student evaluations, those evaluations contained comments about their organization or teaching styles. But as the defendant anticipated that she would, the plaintiff also argues that Rolland, a White male, received similar student evaluations but *was* offered a new contract for the 2020-21 academic year. The parties agree that Rolland was similarly situated to the plaintiff in terms of his student evaluations. For the purposes of summary judgment, the court accepts the plaintiff's argument that Rolland was a similarly situated employee outside the protected classes who was offered an adjunct contract when the plaintiff was not.

That means that if the plaintiff had established the second element of the McDonnell Douglas *prima facie* case (that she was meeting her employer's legitimate expectations), the burden then would shift to the defendant to show that it had a legitimate, non-discriminatory reason for treating Rolland better than it treated the plaintiff. The defendant has articulated such a reason: it has explained that Rolland taught discrete math, and it needed to have someone on the faculty to teach that subject to actuarial students. Because the defendant had a specific need that Rolland met, it offered him an adjunct contract for the 2020-21 academic year but did not offer a contract to the plaintiff. The defendant also has explained that it was increasing the number of full-time faculty and decreasing its reliance on adjuncts, which means that some of the nine adjuncts who had previously been offered contracts would not be offered them again in the 2020-21 academic year.

27

The plaintiff contends that she is challenging "the honesty, not the accuracy," of the defendant's stated, non-discriminatory reason for offering Rolland a contract but not offering her one. Dkt. No. 30 at 27. The plaintiff says that she "would have been qualified to teach discrete math to actuarial students for the 2020-21 academic year." Id. at 28. She points to O'Neill's declaration, in which he says that he believes the plaintiff could have taught discrete mathematics if she had been asked. Id. (citing Dkt. No. 31 at ¶65).

"The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." Stewart v. Henderson, 207 F.3d 374, 378 (7th Cir. 2000). The plaintiff has presented no evidence showing the defendant's stated reason—that it selected Rolland because he already had been teaching discrete math—was pretextual. The plaintiff's belief (and O'Neill's) that she "could have" taught discrete math if she'd been asked is not sufficient evidence to allow a rational fact-finder to infer that the defendant lied about the reason it offered Rolland the adjunct contract. The evidence shows that, unlike the plaintiff, Rolland already had been teaching discrete math. The fact that the defendant did not ask the plaintiff whether she could teach discrete math to actuarial students when the defendant already had an adjunct who was teaching discrete math to actuarial students is not evidence that the defendant lied when it said that offered a contract to Rolland because it needed him to continue teaching the course he had been teaching. The plaintiff may disagree with the defendant's decision to offer a contract to the person who had been teaching the course, rather than

28

asking her whether she could teach it, but that does not mean that the defendant's reasoning was false or pretextual. Nor is the fact that the defendant did not inform the plaintiff of this reason at the time evidence of pretext. Pugh v. City of Attica, Ind., 259 F.3d 619, 629 (7th Cir. 2001) (no evidence of pretext if unstated reason was considered prior to filing suit).

Even if the plaintiff had established her *prima facie* case under McDonnell Douglas (which she has not), she has not demonstrated that the defendant's reason for treating a similarly situated person outside the protected classes better was pretextual.

The plaintiff has not established a *prima facie* case that the defendant discriminated against her based on her race, gender and color when it failed to offer her an adjunct contract for the 2020-21 academic year. The defendant is entitled to summary judgment on all three of the plaintiff's claims as they relate to the defendant's failure to offer her the adjunct contract for the 2020-21 academic year.

B. Failure to Hire the Plaintiff for the October 2019 Assistant Professor Position

1. *The Parties' Arguments*

The defendant argues that all three of the plaintiff's causes of action are time-barred to the extent that they are based on the defendant's failure to hire the plaintiff for the October 2019 assistant professor position. Dkt. No. 21 at 16. It asserts that the plaintiff was required to bring any claims of discrimination to the administrative agency within 300 days of the alleged adverse employment action. Id. (citing 42 U.S.C. §12117(a)). The defendant

29

recounts that the plaintiff's initial charge of discrimination, filed in October 2020, did not include any allegations about the defendant's October 2019 failure to hire her for the assistant professor position—it focused solely on the defendant's failure to offer the plaintiff an adjunct contract for the 2020-21 academic year. Id. at 17. The defendant notes that on March 31, 2021, the plaintiff amended her administrative charge to add the claim relating to the October 2019 assistant professor position, but it argues that that claim began accruing on December 20, 2019, when O'Neill, a member of the hiring committee, informed the plaintiff that she "did not make the cut" for the position—in other words, O'Neill informed her that she was not going to be offered the assistant professor position. Id. The defendant contends that because the plaintiff's claim regarding that position began to accrue on December 20, 2019, she was required to bring file her administrative charge for that claim within 300 days from December 20, 2019—that is, by October 15, 2020. Id. at 17-18. It asserts that she filed her amended charge on March 31, 2021—167 days too late. Id. at 18.

The defendant argues that even if the claim was not time-barred, the plaintiff has presented no evidence that she was not selected because of her race, color or sex. Id. The defendant states that the plaintiff did not even testify at her deposition that she believed the decision was due to discriminatory reasons. Id. at 18–19. It contends that none of the ten search committee members ranked the plaintiff as one of their top candidates. Id. at 20. The defendant explains that it opted to interview the other, more qualified

candidates selected by the search committee. Id. It argues that any inference of discrimination is rebutted by the fact that it offered the position to two female candidates, both of whom declined, and that it intended to offer the position to a third female candidate who withdrew from consideration. Id. at 20–21. The defendant states that it then reopened the position and interviewed a new round of candidates before selecting Jonathan Cox, a White male, for the position. Id. at 21. The defendant asserts that the application materials of the candidates it interviewed demonstrated strong teaching abilities, which the plaintiff's materials lacked. Id. at 21–22. According to the defendant, the plaintiff's bare speculation that "something maybe went on behind closed doors" is insufficient to establish pretext. Id. at 22.

The plaintiff responds that because she timely filed her initial charge, the court should deem the amended charge timely. Dkt. No. 30 at 6. She recounts that she filed her initial charge on October 6, 2020, which she says was nine days before the limitation period on the failure-to-hire claim expired. Id. at 8. She argues that her amended charge was "reasonably related" to the original charge because it described the same conduct, same actors and same bases for discrimination. Id. She maintains that she can bring additional claims that developed from an investigation into the claims she actually raised with the ERD and the EEOC. Id. at 11. She contends that the defendant's failure to hire her in October 2019 is reasonably related to the other instance of the defendant failing to hire her, namely its failure to offer her an adjunct contract for the 2020-21 academic year. Id. at 12–13.

Turning to the merits, the plaintiff argues that the defendant discriminated against her based on her intersectional identity as a Black woman. Id. at 13. She contends that discrimination against Black women can exist "even in the absence of discrimination against [B]lack men or [W]hite women." Id. at 14 (quoting Kimble v. Wis. Dep't of Workforce Dev., 690 F. Supp 2d 765, 770 (W.D. Wis. 2010)). The plaintiff asserts that the defendant's willingness to hire non-Black female candidates for the position does not defeat her *prima facie* case because she can experience intersectional discrimination on multiple bases. Id. at 17–18. She also argues that the defendant's reason for not hiring her is pretextual because it is false. Id. at 18. She asserts that one faculty member on the search committee stated that he ranked the plaintiff in his top candidates and recalled that another member of the search committee did so, as well. Id.

2.   *Analysis*

The plaintiff's claim that the defendant discriminated against her on the basis of race, gender and color when it failed to hire her for the October 2019 assistant professor position is time-barred. Failure to hire is a "discrete" act that occurs on the date that the parties understand the decision to be final. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110–12, 114 (2002). A party must file an administrative charge within 300 days of the date of that discrete act. Id. at 110.

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180–

32

or 300–day time period after the discrete discriminatory act
occurred.

Id. at 113. Only discrete acts that occurred within 300 days before the plaintiff
filed her charge are actionable.

The plaintiff's charge is dated October 6, 2020. Dkt. No. 37 at ¶68.
Assuming that she filed it on that date, only discrete acts that occurred on or
after December 11, 2019 (300 days earlier) are actionable. Although the federal
court complaint and the plaintiff's amended charge assert that O'Neill informed
the plaintiff around December 20, 2019 that her application was unsuccessful,
O'Neill's declaration avers that he informed the plaintiff that she "didn't make
the cut" for the assistant professor position "in or around mid-November." Dkt.
No. 34 at ¶18. O'Neill's last day of employment with the defendant was
November 30, 2019. Id. at ¶3. The plaintiff's proposed findings of additional fact
adopt this mid-November notice date, and the defendant does not dispute it.
Dkt. No. 37 at ¶12.

This is significant, because if the conversation between O'Neill and the
plaintiff *had* taken place on December 20, 2019, it would have been within 300
days of the plaintiff's initial charge, and the court then would need to
determine whether the plaintiff's amended charge could relate back to the
original charge date. But because the plaintiff now has agreed that the
conversation took place in mid-November, as averred in O'Neill's sworn
declaration and supported by the reasonable inference that the conversation
would have taken place before the end of O'Neill's employment with the
defendant, the undisputed facts show that the conversation took place in mid-

33

November. Because the conversation in which O'Neill informed the plaintiff that she "didn't make the cut" occurred before December 11, 2019, her claim that the defendant discriminated against her based on her race, gender and color when it failed to hire her for the October 2019 assistant professor position is time-barred. Because the claim is time-barred, the court need not address the merits of the claim. The court will grant summary judgment for the defendant on the plaintiff's claim that the defendant violated Title VII by discriminating against her based on race, gender and color when it failed to hire her for the October 2019 assistant professor position.

## IV.     Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 20.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 17th day of April, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

34